**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CHARLOTTE E. ADKINS,

     Plaintiff,

v.                                  CIVIL ACTION NO. 3:19-cv-00624

ANDREW SAUL,
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Charlotte E. Adkins ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on August 30, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's motion for judgment on the pleadings and brief in support (ECF Nos. 18, 19) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 22).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY**

Claimant's request to reverse the Commissioner's decision (ECF No. 18), **GRANT** the Commissioner's request to affirm his decision (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 50 years old at the time of her amended alleged disability onset date and 53 years old on the date of the relevant decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 260.)[1] She completed the eleventh grade. (*Id.* at 870.) Most recently, she worked in a clothing retail store, and she has also been employed as a nurse's aide in a personal care home. (*Id.* at 872, 874.) Claimant alleges that she became disabled on May 15, 2015,[2] due to degenerative disc disease of the thoracic and lumbar spine, osteoarthritis, morbid obesity, chronic obstructive pulmonary disease, peripheral neuropathy, deep vein thrombosis, edema, borderline intellectual functioning, gastroesophageal reflux disorder, fibromyalgia, difficulty sleeping, benign hypertension, and learning disability. (*Id.* at 274, 291.)

Claimant filed her applications for benefits on February 25, 2015. (*Id.* at 260–61, 733–39.)   Her claims were initially denied on July 17, 2015, and again upon reconsideration on September 25, 2015. (*Id.* at 91–106, 748–62, 764–66.) Thereafter, on November 3, 2015, Claimant filed a written request for hearing. (*Id.* at 142, 768.) An administrative hearing was held before an ALJ on August 2, 2017, in Huntington, West Virginia. (*Id.* at 865–907.)   On October 23, 2017, the ALJ rendered an unfavorable

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 11.
[2] Claimant initially alleged November 26, 2014, as the onset of her disability. (Tr. at 286.)  She later moved to amend her alleged onset date to May 15, 2015, and her motion was granted.  (*Id.* at 274, *see id.* at 112.)

decision. (*Id.* at 107–25.) Claimant then sought review of the ALJ's decision by the Appeals Council on December 11, 2017. (*Id.* at 186–214, 788–816.)

On May 16, 2018, the Appeals Council granted Claimant's request for review and remanded the case to another ALJ for further consideration. (*Id.* at 817–20.) A second administrative hearing was held on November 19, 2018, in Huntington, West Virginia. (*Id.* at 841–64.) The second ALJ rendered an unfavorable decision on December 19, 2018. (*Id.* at 24–38.) Claimant again sought review of the ALJ's decision by the Appeals Council on December 26, 2018. (*Id.* at 22–23.) The Appeals Council denied Claimant's request for review on July 1, 2019, and the second ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 9–11.)

Claimant timely brought the present action on August 29, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 10) and a transcript of the administrative proceedings (ECF No. 11). Claimant subsequently filed her motion for judgment on the pleadings and brief in support (ECF Nos. 18, 19), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 22). As such, this matter is fully briefed and ready for resolution.

B.  *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1.  *Medical Treatment During Relevant Period*

On March 19, 2015, Claimant presented to a pain management center for a consultation for her low back and leg pain. (Tr. at 588.) She described her pain as

constant dull, aching; squeezing, tight; burning, hot; sharp, stabbing; shooting, "electric like"; and numbness, "pins and needles," and she related that cold and touch were painful. (*Id.*)  She reported that her pain was worse when coughing, waking up in the morning, in the evening, at night, when bending forward or backward, when lying down or reclining, and when standing, walking, sitting, and driving or riding in a car.  (*Id.* at 588, 590.) Claimant related that she did not have problems emptying her bowels or bladder, that her legs did not give way and she did not drop objects from her hands, that she never had to quit physical therapy due to increased pain, and that she did not go to the emergency room more than once for the same pain problem.  (*Id.* at 590.)  She also reported feeling severe anger, stress, irritability, depression, guilt, hopelessness, and fear.  (*Id.*)  She rated her average pain as an eight and her worst pain as a ten, on a scale where ten is the "[w]orst pain one can imagine, no pain can be worse than this."  (*Id.*)

Upon physical examination, the pain management specialist observed that Claimant "stands and walks unassisted" with a non-antalgic gait and had normal posture. (*Id.* at 593.)  He noted that Claimant "can walk on heels and toes with difficulty and reports that it is painful to walk."  (*Id.*)  Claimant's lumbar flexion was 20°, her lumbar extension was "[c]lose to 0 degrees," her lateral flexion was 5° bilaterally, and she had good rotation.  (*Id.* at 594.)  Although the pain management specialist observed "no segmental pain in the lumbar spine," he noted "facet column pain in the lumbar spine" and stated that Claimant's right sacroiliac joint and coccyx were "painful on palpation." (*Id.*)  He also observed "[s]cattered trigger points . . . in the paraspinal and gluteal muscles bilaterally."  (*Id.*)  He examined Claimant's lower extremities and noted "non pitting edema," hyperpathia, and hyperalgesia in Claimant's left leg but observed that her "[l]ower extremity movements are unrestricted and non-painful" and that she had full

muscle strength "on a global basis." (*Id.*)  A straight-leg raising test was positive for low back pain bilaterally, a modified Gaenslen test was positive on the right and "questionably positive" on the left, and a Faber test was negative bilaterally.  (*Id.*)

The pain management specialist diagnosed Claimant with sacroiliac joint syndrome on the right, hypertrophic facet arthropathy, degenerative disc disease, myofascial pain syndrome, and deconditioning.  (*Id.* at 595.)  He recommended nerve blocks and trigger point injections, physical therapy, and smoking cessation.  (*Id.*) Claimant had two diagnostic injections on April 8 and 21, 2015, to determine "if the [sacroiliac] joint is a significant pain generator" and was directed to follow up "to assess pain relief and to determine future treatment." (*Id.* at 582–87.)

On January 25, 2016, Claimant underwent an outpatient physical therapy lumbar evaluation. (*Id.* at 545–46.)  She reported pain "in both sides of the low back" that renders her "unable to lay flat on her back." (*Id.* at 545.)  She related that "when [she] turns in certain ways it feel [sic] like something is moving around in her back." (*Id.*)  She stated that she sleeps on her left side and that she has difficulty sleeping. (*Id.*)  Claimant also reported numbness in her left leg "when she sits too long" and being unable to cross her legs. (*Id.*)  She stated that "[s]he is most comfortable sitting in a reclined position" but "has trouble when she gets up because she is so stiff." (*Id.*)  She reported that her legs "try[] to giv[e] out on her if she is on them too long" and related that she had fallen in the past "due to her [legs] giving out on her" and that she had "poor balance." (*Id.*)  Still, Claimant reported that she could independently get in and out of bed, ambulate in her home and in the community, use stairs, get in and out of a car, use the toilet, and bathe, dress, and groom herself.  (*Id.*)

An examination revealed pain in Claimant's paraspinal muscles, spinous processes, iliac crests, gluteals, sacrum, coccyx, ischial tuberosities, greater trochanters, piriformis, and bilateral quadratus lumborum. (*Id.* at 546.) Spinal flexion, extension, and side bends were limited, and she was observed to have moderate strength in her lower extremities. (*Id.*) Claimant's hip and knee flexion and extension were observed to be "4/5," and she had normal muscle tone. (*Id.*) She was able to independently roll left and right, scoot, stand up and sit down, get in and out of bed, and sit on the toilet, but it was noted that she avoided supine positions. (*Id.*) Claimant was able to ambulate independently without an assistive device for a measured distance of twenty meters. (*Id.*) It was noted that Claimant used two feet per step when climbing stairs and that she "shifts weight backwards while going up the stairs" and "stubbed the left toes on the third step causing mild [loss of balance]." (*Id.*) She was scheduled for a twice-weekly course of physical therapy. (*Id.* at 547.)

On May 10, 2016, Claimant presented to an optometrist, complaining of blurry vision in both eyes. (*Id.* at 602.) She was diagnosed with mild nearsightedness and mild hypertensive retinopathy. (*Id.* at 603.) She was given a new glasses prescription and directed to follow up yearly, monitor her blood pressure, and diet and exercise. (*Id.* at 603–04.) She was also scheduled to undergo additional testing two months later. (*Id.* at 604.)

Claimant presented to an urgent care clinic on December 5, 2016, complaining of "[l]eft leg redness and swelling." (*Id.* at 618.) She was diagnosed with cellulitis and prescribed medication. (*Id.* at 619.)

On January 23, 2017, Claimant presented to a neurologist for evaluation of her low back pain. (*Id.* at 551.) She reported that "she has had continued issues with low back

pain and bilateral lower extremity weakness" that "has worsened since she was last seen in February 2013." (*Id.*)  She related that "she is unable to walk even short distances without issues with pain in the legs and the lower back" and "has had falls secondary to the low back and leg weakness." (*Id.*)  She reported "[t]wo or more falls in the past year" and rated her back pain as an eight on the pain scale.  (*Id.* at 553.)  Upon physical examination, Claimant was "well appearing and well nourished" and in "[n]o acute distress." (*Id.*)  Her muscle strength was normal "throughout . . . including hip flexors, knee extensors and ankle dorsiflexors." (*Id.*)  "Mild tenderness of lumbar region midline" was noted, and it was observed that Claimant "does not have sensory level in entire back." (*Id.*)  The provider ordered an MRI of Claimant's spine and contemplated a referral to neurosurgery.  (*Id.* at 554.)  Claimant was directed to follow up in six weeks.  (*Id.*)

Claimant underwent a mammogram on January 31, 2017, that noted an "[i]nferior left breast nodule" that was thought to be "an intramammary lymph node." (*Id.* at 606.)  A follow-up mammogram performed on February 7, 2017, revealed that the nodule was a lymph node.  (*Id.* at 609.)

Claimant returned to her neurology provider on June 16, 2017, and the provider noted that Claimant's "insurance denied the [MRI] as she at that time had not failed conservative management." (*Id.* at 598.)  Claimant reported having physical therapy "twice weekly for 6 weeks" with "no improvement" and stated that she continued to experience "low back pain, numbness, tingling and weakness in both lower extremities." (*Id.*)  She reported "[s]ome improvement" in her leg swelling with medication from her primary care physician, but "weakness and paresthesias are still present." (*Id.*)  Upon physical examination, Claimant was "well appearing and well nourished" and in "[n]o acute distress." (*Id.* at 600.)  She had "[b]ilateral lower extremity weakness 4/5" but

normal muscle tone. (*Id.*) Her leg reflexes were decreased, but she had "normal sensation." (*Id.* at 600–01.) The provider also observed "[m]ild tenderness of lumbar region midline." (*Id.* at 601.) She again ordered an MRI and instructed Claimant to return in six to eight weeks. (*Id.*) The MRI was conducted on July 1, 2017, and revealed "significant progression of [Claimant's] multilevel discogenic degenerative changes and facet arthropathy" since the previous MRI dated January 3, 2013. (*Id.* at 615.) The radiologist noted, "Although there is no high-grade spinal stenosis, there is multilevel neural foraminal stenosis which has worsened in the interim" and "is severe on the right at L2-L3." (*Id.*) He further noted that "[e]ndplate edema and enhancement at the L2-L3 level is suspected to be degenerative in nature rather than infectious, given the absence of any disc signal abnormality or enhancement." (*Id.*)

On July 11, 2017, Claimant presented to her primary care physician and reported that "her fibromyalgia is still present everyday [sic] but tolerable with meds," that "[h]er back pain is also present everyday [sic], made worse when walking for long periods of time and causes radiculopathy when sitting too long," that her blood pressure "is doing well" and she was "tolerating meds well," that she "has regular symptoms [of congestive heart failure] with shortness of breath" and "lower extremity edema which gets better with limiting fluid and salt intake," that "[h]er [chronic obstructive pulmonary disease is managed well with [medication]" but "[s]he is still a current 1pack/day smoker," and that she wanted to lose weight because "she has had a 29 lb weight increase since January." (*Id.* at 724.) Upon physical examination, Claimant had edema in her legs and walked with an antalgic gait. (*Id.* at 727.) Her physician modified her medication regimen and counseled her on smoking cessation and weight loss and healthy dietary choices. (*Id.* at 727–28.)

8

At a follow-up appointment with her neurology provider on August 11, 2017, Claimant reported that her low back and leg pain had worsened since her previous appointment. (*Id.* at 708.) Her provider noted that "[s]he has been referred to neurosurgery but is not scheduled until October 2017." (*Id.*) Claimant rated her back pain as an eight on the pain scale that day. (*Id.* at 710.) Upon physical examination, Claimant's provider noted "[b]ilateral lower extremity weakness 4/5" and "[m]ild tenderness of lumbar region midline." (*Id.* at 711.) Claimant was instructed to return "once seen by neurosurgery." (*Id.* at 713.) Claimant presented to the neurosurgeon on August 25, 2017, complaining of back and leg pain. (*Id.* at 704.) The neurosurgeon noted, "On exam she had good motor power in the lower extremities. Straight leg raising test caused back pain bilaterally." (*Id.* at 706.) He did not recommend surgery because "[i]t would not help her back dominant pain, and could actually worsen it," so he and Claimant "agreed that she will monitor symptoms" and return for reassessment "[i]f her leg symptoms become the dominant symptoms in the future." (*Id.*) Claimant presented to her neurology provider on October 9, 2017, and stated that her symptoms had not worsened since her last appointment and her leg swelling had improved with the changes in her medication, so she was "able to move around much better." (*Id.* at 700.) Still, she rated her back and leg pain as an eight on the pain scale that day. (*Id.* at 702.) Upon physical examination, Claimant's provider noted "[b]ilateral lower extremity weakness 4/5" but no other abnormal findings. (*Id.* at 703.) She directed Claimant to follow up in six months. (*Id.*)

On March 7, 2018, Claimant presented to her primary care provider to request medication refills and stated "that her neuralgia is well controlled with her current [medication] regimen." (*Id.* at 694.) She also reported that she "continues smoking 1

pack [of cigarettes] per day." (*Id.*) A physical examination was normal. (*Id.* at 697.) Claimant was instructed to continue her current medications, counseled on smoking cessation, and directed to return in three months. (*Id.* at 698.)

Claimant presented to her neurology provider on April 9, 2018, "continu[ing] to endorse chronic lower back pain with numbness" but denying worsening symptoms since her last appointment. (*Id.* at 689.) She reported that "she has been doing ok on [her] current medications but is interested in a back brace." (*Id.*) She also mentioned a desire to be reevaluated for sleep apnea. (*Id.*) She rated her back pain as an eight on the pain scale that day. (*Id.* at 691.) A physical examination revealed that Claimant had full strength in her upper extremities, slightly decreased strength in her lower extremities, and decreased range of motion in her spine. (*Id.* at 692.) Her provider noted that she was "uneasy during examination due to decreased balance." (*Id.*) A straight-leg raising test was negative. (*Id.*) Claimant was referred to her neurosurgeon "to discuss back brace for symptomatic control," but she declined physical therapy or pain management referrals. (*Id.*) She was also referred for a sleep study. (*Id.*) Claimant's neurosurgeon evaluated her on April 12, 2018, but he "recommended against using a brace, since she has a wider abdominal girth, and it would be unlikely that the brace provide [sic] any significant support." (*Id.* at 687.) He stated that "her best hope of limiting her back pain would be to strengthen her paraspinal musculature which can be done with exercises provided to her during physical therapy." (*Id.*)

Claimant returned to her primary care physician on August 1, 2018, and reported that she continued to smoke one pack of cigarettes per day and had "not made any dietary changes since [her] previous visit." (*Id.* at 677.) She reported no issues with her blood pressure, but her physician encouraged her to monitor it at home. (*Id.*) Claimant related

that "she is under a lot of stress and has been battling with anxiety" due to "family issues and worries" but was "stable" with medication.  (*Id.*)  A physical examination was normal, and Claimant was observed to be fully oriented with a normal mood and affect.  (*Id.* at 680.)  Her provider decreased her anxiety medication dosage and again encouraged her to quit smoking and to diet and exercise.  (*Id.* at 682.)  About a month later, on September 5, 2018, Claimant again presented to her primary care provider, "complain[ing] of having burning at the end of urinating [and] low back pain."  (*Id.* at 665.)  She reported that she was smoking about two packs of cigarettes per day and that anxiety related to "family issues, particularly her daughters with addiction," contributed to her smoking.  (*Id.*)  She rated her back pain as an eight on the pain scale that day.  (*Id.* at 668.)  A physical examination was normal, and Claimant was observed to be fully oriented with a normal mood and affect.  (*Id.* at 668–69.)  Claimant was diagnosed with a urinary tract infection and prescribed medication.  (*Id.* at 669.)  Her physician recommended physical therapy for her back pain, but Claimant "declined due to insurance and payment issues." (*Id.*)  He also "[e]ncouraged weight loss and daily exercise as [Claimant's] weight is contributing to back pain."  (*Id.*)  He again counseled her on smoking cessation.  (*Id.*)

On October 3, 2018, Claimant presented to a sleep disorders specialist for an evaluation for sleep apnea.  (*Id.* at 656.)  She reported shortness of breath on exertion, chest and nasal congestion, chronic cough, snoring, and "[a]waken[ing] with a choking sensation."  (*Id.*)  She stated that she slept for four hours each night and napped during the day.  (*Id.*)  A physical examination was normal, and the specialist observed that Claimant was fully oriented with a normal mood and affect.  (*Id.* at 659–60.)  The specialist noted that Claimant "appears to have obstructive sleep apnea" with "underlying [chronic obstructive pulmonary disease]."  (*Id.* at 661.)  He ordered testing and a sleep

study. (*Id.* at 660.) The sleep study was negative for sleep apnea syndrome but suggestive of restless leg syndrome due to "periodic leg movements in sleep." (*Id.* at 644.)

Several days later, on October 8, 2018, Claimant returned to her neurology provider, continuing to complain of back pain with numbness and weakness in her legs, as well as "decreased sensation" in her lower left leg. (*Id.* at 647.) She stated that her symptoms worsened "when sitting down for long periods of time, especially on hard surfaces." (*Id.*) She reported that "she has recently started back on ibuprofen . . . and that it helps." (*Id.*) She again requested a back brace, and she also stated that "she frequently drops her phone for no reason due to weakness/tingling in upper extremities." (*Id.*) Claimant rated her back pain as an eight on the pain scale that day. (*Id.* at 649.) A physical examination revealed "pitting edema in [Claimant's] bilateral lower extremities," slightly decreased strength in the lower extremities, and decreased sensation in the lower left leg. (*Id.* at 650.) Claimant's provider also observed decreased range of motion in Claimant's spine and that she was "uneasy during examination due to decreased balance." (*Id.*) A straight-leg raising test was negative. (*Id.*) Claimant's provider ordered another MRI and directed her to return in six weeks "once imaging is complete." (*Id.* at 651.) The MRI was conducted on November 10, 2018, and revealed "[s]coliotic curvature with multilevel discogenic degenerative changes and facet arthropathy" and "[i]nterval worsening at the L3-L4 and L4-L5 levels when compared to the [June 1, 2017] study." (*Id.* at 731.) It also revealed "up to moderate to severe spinal stenosis at the L4-L5 level," "[s]evere right neural foraminal stenosis at L2-L3," and "[s]evere left neural foraminal stenosis at L4-L5." (*Id.*)

2. *Consultative Examination: Dr. Stephen Nutter, M.D.*

Consultative examiner Dr. Stephen Nutter, M.D. ("Dr. Nutter") performed an internal medicine examination of Claimant on June 19, 2018. (*Id.* at 625–36.) Claimant reported experiencing "problems with her legs for about 6 years," characterized by "constant," "throbbing" pain "from her ankles up to her knees and also in the posterior thigh area" and leg swelling that "is worse with dependency and helped by elevation." (*Id.* at 625.) She stated that her knees swell and that "walking, standing, kneeling, squatting and going up and down stairs" increased the pain in her hips and knees. (*Id.* at 626.) She also reported experiencing "back pain for 6 years since she was lifting a patient and hurt her back" and "neck pain for 6 years" with no associated injury. (*Id.* at 625.) She stated that she suffered from "constant pain in the upper and lower back" that was "aggravated by bending, stooping, sitting, lifting, standing, coughing, and riding in a car." (*Id.*) She related that her lower back pain "radiates down both legs," causing "numbness and tingling in her legs and her back," and that "[w]alking hurts her back." (*Id.*) She reported "constant neck pain that does not radiate down either arm" but worsened when she coughed and shoulder pain aggravated by "reaching, lifting, pushing, pulling and using the arms overhead." (*Id.* at 625–26.) She also stated "that she sometimes drops things she is holding onto with her hands and that she has 'fibromyalgia all over.'" (*Id.* at 626.)

Upon physical examination, Dr. Nutter observed that Claimant "ambulates with a normal gait, which is not unsteady, lurching, or unpredictable" and did so without "a handheld assistive device." (*Id.* at 627.) He further observed that Claimant "appears stable at station and comfortable in the supine and sitting positions." (*Id.*) He noted no abnormal findings related to Claimant's neck, but he observed what "may have been a very faint wheeze" when listening to her lungs, without chest tenderness or shortness of

13

breath "with exertion or when lying flat." (*Id.*)  Dr. Nutter observed "some broken veins in both lower legs," as well as "pitting edema" and hair loss, without "temperature changes or pigmentary changes." (*Id.*)

When Dr. Nutter examined Claimant's upper extremities, he noted no abnormalities but stated that Claimant's "[s]houlder range of motion is limited due to subjective complaints of back pain." (*Id.*)  Dr. Nutter related that Claimant's shoulder flexion was 145° on the right and 140° on the left, where normal is 180°, but her shoulder abduction, internal rotation, and external rotation were normal.  (*Id.* at 630.)  He observed that Claimant "is able to make a fist bilaterally" and "write and pick up coins with either hand without difficulty." (*Id.* at 627.)  He rated Claimant's grip strength as "intact at 5/5 bilaterally." (*Id.*)  She had largely normal range of motion in her elbows, wrists, and hands.  (*Id.* at 630.)  Moving on to Claimant's lower extremities, Dr. Nutter observed "pain with range of motion testing in both knees" as well as "crepitus in both knees, more noticeable on the left than the right." (*Id.* at 628.)  Claimant's knee flexion was observed to be 90° bilaterally, where normal is 150°. (*Id.* at 630.)  Dr. Nutter also observed "some bony enlargement of the knees." (*Id.* at 628.)  However, he noted "no tenderness, redness, warmth, swelling, effusion, or laxity" in the knees and "no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the ankles or feet." (*Id.*)  He observed "no calf tenderness, redness, warmth, cord sign or Homan's sign." (*Id.*)  He rated Claimant's "hip flexion and extension, knee strength, dorsiflexion, plantar flexion, [and] toe extensor strength to be a 3/5 bilaterally with submaximal voluntary effort." (*Id.*)  He observed that Claimant could not tandem walk but could "walk on the heels and toes" and that she "was unable to squat bending her knees more than 15 to 20 degrees due to knee pain." (*Id.*)

Dr. Nutter examined Claimant's cervical spine and observed no tenderness or "evidence of paravertebral muscle spasm" but stated that "[r]ange of motion testing . . . causes neck pain." (*Id.*) Claimant's range of motion upon extension, right and left lateral flexion, and right and left rotation was somewhat limited. (*Id.* at 630.) When examining her dorsolumbar spine, Dr. Nutter noted that he "cannot appreciate any definite scoliosis but decreased forward bending does limit accuracy." (*Id.* at 628.) He observed "no evidence of paravertebral muscle spasm" but "some tenderness in the paraspinal muscles and the lumbar spine." (*Id.*) He stated that Claimant "complained of pain with range of motion testing of the lumbar spine." (*Id.*) Her flexion was limited to 40° where 90° is normal, and her right and left lateral flexion were limited to 10° where 30° is normal. (*Id.* at 630.) A straight-leg raising test was normal "in the sitting and supine position," but Dr. Nutter observed that Claimant "did not seem able to stand on one leg at a time." (*Id.* at 628.)

Dr. Nutter diagnosed Claimant with a chronic cervical and dorsolumbar strain, osteoarthritis, and leg pain. (*Id.*) He summarized that Claimant "claim[ed] problems with leg pain, joint pain, back and neck pain" and that "[t]here were positive physical findings related to those complaints." (*Id.*)

Dr. Nutter also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form, in which he opined that Claimant could lift and carry up to 10 pounds continuously, 11–20 pounds frequently, 21–50 pounds occasionally, and 51–100 pounds never due to her back, neck, joint, and leg pain. (*Id.* at 631.) Dr. Nutter further opined that Claimant could sit for three hours at a time without interruption, up to four hours in an eight-hour workday, and stand and walk for an hour at a time without interruption, up to two hours in an eight-hour workday. (*Id.* at 632.) He noted that she

15

did not require a cane to ambulate. (*Id.*) Dr. Nutter opined that Claimant could frequently reach and reach overhead bilaterally; continuously handle, finger, and feel bilaterally; occasionally push/pull bilaterally; and continuously operate foot controls bilaterally. (*Id.* at 632–33.) He opined that Claimant could never climb stairs, ramps, ladders, or scaffolds or balance and occasionally stoop, kneel, crouch, and crawl. (*Id.* at 633.) He also opined that Claimant could never work around unprotected heights but could occasionally operate a motor vehicle and be exposed to moving mechanical parts, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibrations. (*Id.* at 634–35.) Finally, Dr. Nutter opined that Claimant can perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single band rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, and use paper or files. (*Id.* at 635.)

    *3.  Opinion Evidence: Dr. Gregory Chaney, M.D.*

On June 3, 2014, Dr. Gregory Chaney, M.D. ("Dr. Chaney"), Claimant's primary care physician,[3] completed a Residual Physical Functional Capacity Evaluation form for her. (*Id.* at 640.) Dr. Chaney listed Claimant's primary diagnoses as osteoarthrosis, spinal disc disorders, and fibromyalgia; her secondary diagnoses as chronic obstructive pulmonary disease, leg edema, deep vein thrombosis, and sleep apnea; and her other

---

[3] Although Claimant represents that Dr. Chaney is her primary care physician (ECF No. 19 at 3), it does not appear that he treated her during the relevant period of March 2015 until December 2018.

diagnoses as peripheral neuropathy, gastroesophageal reflux disease, learning disability, and obesity. (*Id.*)

When asked to identify Claimant's exertional limits, Dr. Chaney opined that Claimant could lift and carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk for less than two hours; sit for less than two hours in an eight-hour workday; would need to alternate between sitting and standing every twenty to thirty minutes; and was limited in her ability to push and/or pull with her upper and lower extremities. (*Id.*)

When asked about Claimant's postural limitations, Dr. Chaney opined that Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds but never balance, stoop, kneel, crouch, or crawl. (*Id.*) And when asked about Claimant's manipulative limitations, Dr. Chaney opined that Claimant was limited in her abilities to reach in all directions and to feel but unlimited in her abilities to handle and finger. (*Id.*) When asked about Claimant's communicative limitations, Dr. Chaney opined that Claimant was unlimited in her abilities to hear and speak. (*Id.*)

Finally, when asked about Claimant's environmental limitations, Dr. Chaney opined that Claimant should avoid all exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, etc., and hazards; avoid moderate exposure to wetness; avoid exposure to noise; and never work around heights or moving equipment. (*Id.*)

Dr. Chaney further opined that Claimant "has been disabled since May 2012." (*Id.*)

C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

17

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

18

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations."  *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work."  *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will

find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through June 30, 2017. (Tr. at 29.) She further determined that Claimant had not engaged in substantial gainful activity since the amended alleged onset of her disability. (*Id.*) She found that Claimant's degenerative disc disease, osteoarthritis, obesity, chronic obstructive pulmonary disease, peripheral neuropathy, edema, and borderline intellectual functioning constituted "severe" impairments. (*Id.* at 29–30.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 30–32.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform a limited range of light level work except she can occasionally lift twenty pounds and ten pounds frequently; sit for four hours in an eight hour day, for three hours at a time; stand for two hours in an eight hour day, one hour at a time; [and] walk for two hours in an eight hour day, one hour at a time." (*Id.* at 32–33.) The ALJ further found that Claimant can "frequently reach and push/pull; never climb or balance; occasionally stoop, kneel, crouch or crawl; never work around unprotected heights; occasionally work around moving mechanical parts or operate a motor vehicle[; and] occasionally can be exposed to humidity and wetness, pulmonary irritants, temperature extremes, and vibration." (*Id.* at 33.) In addition, she found that Claimant "can perform simple, repetitive, routine tasks, with only occasional changes in the work setting." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 37.) She noted that Claimant is "an

individual closely approaching advanced age" with "a limited education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a VE to aid in her finding that Claimant is capable of working as a routing clerk, price marker, or inspector. (*Id.* at 38.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from May 15, 2015, through the date of this decision." (*Id.*)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the second ALJ did not comply with the Appeals Council's directives on remand. (ECF No. 19 at 17–21.) She further argues that the ALJ failed in her duty to develop the record with respect to Claimant's lumbar radiculopathy, spinal stenosis, depression, anxiety, deep vein thrombosis, gastroesophageal reflux disease, fibromyalgia, sleep apnea, and hypertension, in addition to arguing that the ALJ ignored the opinions of Dr. Chaney, Claimant's primary care physician. (*Id.* at 21–22.) Lastly, Claimant argues that the ALJ failed to consider the combined effect of her impairments at the third step of the sequential evaluation process and again points to the ALJ's rejection of Dr. Chaney's opinions. (*Id.* at 22–23.) Claimant asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 23.) The Commissioner responds that the ALJ fully complied with the Appeals Council's remand order. (ECF No. 22 at 8–11.) He argues that the ALJ had no further duty to develop the record, properly disregarded Dr. Chaney's opinion, and identified unskilled work that Claimant could perform. (*Id.* at 11–15.) The Commissioner also contends that the ALJ stated that she considered Claimant's impairments at step three of the sequential evaluation process and that Claimant has not identified any additional limitations the ALJ did not consider in the RFC assessment. (*Id.* at 15–16.) Finally, he argues that reversal for an award of benefits is not an appropriate remedy in this case. (*Id.* at 16.)

### A. Compliance with Appeals Council Remand Order

Claimant first argues that she was unfairly prejudiced by the second ALJ's failure to follow the instructions outlined in the Appeals Council's May 16, 2018 remand order. (ECF No. 19 at 17–21.) That order directed the ALJ to reevaluate whether Claimant's

degenerative disc disease of the thoracic and lumbar spine reached Listing-level severity at step three of the sequential evaluation process; to obtain additional evidence concerning Claimant's degenerative disc disease of the thoracic and lumbar spine, osteoarthritis, morbid obesity, chronic obstructive pulmonary disease, peripheral neuropathy, edema, and borderline intellectual functioning; to conduct an updated RFC assessment; and to hear supplementary VE testimony, if warranted by the expanded record. (Tr. at 819–20.) Claimant asserts that the ALJ did not comply with any of these directives. (ECF No. 19 at 18.)

When the Appeals Council remands a case to the ALJ, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.1477(b). In this District, the ALJ's failure to do so "constitutes legal error"; however, reversal and remand are required only where the claimant demonstrates that the ALJ's decision might reasonably have been different or would not be supported by substantial evidence had the ALJ complied with the remand order. *Huddleston v. Astrue*, 826 F. Supp. 2d 942, 955 (S.D.W. Va. 2011). Here, the ALJ followed the directives of the Appeals Council's May 16, 2018 remand order,[4] but even if she did not, Claimant has not made the requisite showing of prejudice.

### 1. Reevaluation of Degenerative Disc Disease at Step Three

The ALJ explicitly considered whether Claimant's degenerative disc disease satisfied Listings 1.02A and 1.04. (Tr. at 30–31.) The Appeals Council instructed her

---

[4] The Appeals Council denied Claimant's request for review of the second ALJ's written decision (Tr. at 9–11), which suggests that it found no deficiency in the ALJ's compliance with its order. *See* 20 C.F.R. §§ 404.970(a)(2), 416.1470(a)(2) (providing that "Appeals Council will review a case if . . . [t]here is an error of law").

merely to reevaluate whether any Listings were met, and to heed SSAR 15-1(4), 2015 WL
5697481 (Sept. 23, 2015), when considering Listing 1.04A. (*Id.* at 819.) Claimant does
not argue that the ALJ failed to assess whether her degenerative disc disease met or
medically equaled any listed impairments, nor does she contend that the ALJ did not
account for SSAR 15-1(4). (*See* ECF No. 19 at 18–19.) Because the May 16, 2018 remand
order required nothing more, the undersigned **FINDS** that the ALJ's reevaluation of
whether Claimant's degenerative disc disease surpassed Listing-level severity at the third
step of the sequential evaluation process complies with the Appeals Council's directives.

Claimant's argument that it did not instead appears to be a challenge to the ALJ's
conclusion that Claimant's degenerative disc disease of the thoracic and lumbar spine did
not satisfy Listings 1.02A or 1.04C. (*See id.*) She contends that the ALJ "merely reiterated
the views espoused in the [first ALJ's] decision" and improperly relied on "clearly
erroneous evidence" showing that Claimant could ambulate effectively and ignored other
evidence indicating Claimant's "problems with ambulation." (*Id.*) Specifically, Claimant
points to consultative examiner Dr. Nutter's findings that she "has pain, limited range of
motion, and crepitus in both knees" that "could have caused issues with ambulation." (*Id.*
at 19.)

Listing 1.02A covers major joint dysfunction that is "[c]haracterized by gross
anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of
motion or other abnormal motion of the affected joint(s), and findings on appropriate
medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of
the affected joint(s)" and involves "one major peripheral weight-bearing joint (i.e., hip,
knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20
C.F.R. pt. 404, subpt. P, appx. 1, § 1.02A. Listing 1.04, on the other hand, deals generally

with spinal disorders "resulting in compromise of a nerve root . . . or the spinal cord," and Listing 1.04C, in particular, covers "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id.* § 1.04C.

For purposes of each of those Listings, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.00B2b(1). By contrast, "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and "must have the ability to travel without companion assistance to and from a place of employment or school." *Id.* § 1.00B2b(2).

Here, the ALJ found that Claimant's musculoskeletal impairments did not satisfy Listing 1.02A because "the examining and treating physicians' reports show the claimant does not have the ambulatory deficits described." (Tr. at 30.) And with respect to Listing 1.04C, the ALJ observed that "there is no evidence of . . . lumbar spinal stenosis resulting in pseudoclaudication." (*Id.*) She also explained, "despite the objective findings [of lumbar spinal stenosis], the evidence indicates the claimant uses no cane or assistive device to ambulate and there is no evidence that she cannot ambulate or use her hands and arms effectively." (*Id.* at 31.) None of the evidence Claimant cites in her brief is contrary to the ALJ's findings. (ECF No. 19 at 19.) In fact, some of that evidence—Dr. Nutter's June 19, 2018 consultative examination report included—overtly states that Claimant was able to walk independently, with a normal gait, without the use of an

26

assistive device.  (Tr. at 500, 524, 546, 627.)  The remainder simply lists Claimant's diagnoses or rehashes her self-reported symptoms.  (*Id*. at 427, 431, 445, 545, 551, 559, 565.)

In sum, Claimant's argument misses the point.  The pertinent inquiry is not whether Claimant has conditions that could reasonably decrease her ability to ambulate effectively; rather, she bears the burden to supply evidence showing that they actually did so.  *See Dick* ex rel. *Dick v. Berryhill*, 416 F. Supp. 3d 564, 573 (W.D.N.C. 2019) ("It is always a claimant's burden to present evidence that an impairment or combination of impairments meets or equals a listed impairment by presenting medical findings either meeting all of the criteria of a listed impairment or equal in severity to all the criteria for the one most similar listed impairment." (citing 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990))); *Parsons v. Berryhill*, No. 3:18-cv-01107, 2019 WL 2252023, at *11 (S.D.W. Va. May 2, 2019) ("[A] diagnosis alone is insufficient to establish the severity of an impairment; rather, '[t]here must be a showing of related functional loss.'" (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986))).  She has not produced such evidence in this case.  And where the record contains conflicting evidence, the resolution of such conflicts lies within the exclusive province of the ALJ.  *Straw v. Saul*, No. 3:20-cv-00028, 2020 WL 3230457, at *18 (S.D.W. Va. May 28, 2020) ("[T]he reconciliation of conflicting evidence [is] for the ALJ to resolve, not this Court."), *adopted by* 2020 WL 3229329 (S.D.W. Va. June 15, 2020).  She resolved them here by summarizing that "the severity of the pain alleged by the claimant and her limitations are not consistent with the objective findings" or Claimant's "participat[ion] in a wide variety of activities."  (Tr. at 36.) Accordingly, the undersigned **FINDS** that the ALJ's conclusion

that Claimant's degenerative disc disease did not satisfy Listings 1.02A or 1.04C is supported by substantial evidence.

### 2. *Additional Medical Evidence*

Upon remand, the ALJ obtained Claimant's medical treatment records dated after the first ALJ's unfavorable decision because Claimant's counsel provided them prior to the hearing. (*See* Tr. at 642–732.) She also ordered the consultative physical examination from Dr. Nutter. (*Id*. at 625–38.) In addition, Claimant's counsel provided a Residual Physical Functional Capacity Evaluation form completed by Dr. Chaney on June 3, 2014. (*Id*. at 639–41.) The ALJ heard further testimony from Claimant about her physical and mental impairments in a hearing held on November 19, 2018. (*Id*. at 841–64.)

Notably, Claimant fails to identify any evidence necessary for the ALJ to evaluate her degenerative disc disease of the thoracic and lumbar spine, osteoarthritis, morbid obesity, chronic obstructive pulmonary disease, peripheral neuropathy, edema, and borderline intellectual functioning that was not before the ALJ at the time she rendered her decision. (*See* ECF No. 19 at 19–20.) It is therefore unclear what more Claimant argues the ALJ should have obtained, or how that unknown evidence would have affected the ALJ's findings. In other words, even if the ALJ could have secured additional evidence that she did not obtain, the undersigned **FINDS** that Claimant has not shown that she was prejudiced by the ALJ's failure to do so, as is necessary to warrant reversal and remand. *Huddleston*, 826 F. Supp. 2d at 955.

Instead of identifying probative evidence that the ALJ allegedly did not gather, Claimant complains that the ALJ relied only on Dr. Nutter's June 19, 2018 consultative examination report in rendering her decision, to the exclusion of the other "new" evidence she obtained. (ECF No. 19 at 19–20.) Claimant's argument that the ALJ did not consider

28

the other evidence is wholly without merit: the ALJ conspicuously mentions Claimant's

hearing testimony, the most recent treatment records, and even Dr. Chaney's June 3, 2014

opinions, in addition to Dr. Nutter's consultative examination report. (Tr. at 30–35.) And

contrary to Claimant's suggestion, the ALJ did not adopt Dr. Nutter's "significant[ly]

divergen[t]" (ECF No. 19 at 19–20) findings but rather concluded that "a reduction to

light work [was] warranted" in light of Claimant's treatment records. (Tr. at 35.) The

undersigned therefore **FINDS** that the ALJ abided by her obligation to consider all of the

newly obtained evidence. *See Hawkins v. Berryhill*, No. 2:16-cv-09131, 2018 WL

1557263, at *8 (S.D.W. Va. Mar. 30, 2018) ("[T]he ALJ is required to consider all of the

evidence in the case record when making a disability determination . . . ." (citing 20 C.F.R.

§ 404.1520(a)(3)) (emphasis deleted)).

   *3. RFC Assessment*

   Consistent with the Appeals Council's instructions, the ALJ conducted a new RFC

assessment that explained her "rationale with specific references to evidence of record in

support of the assessed limitations" and considered the November 25, 2014 written

decision on a previous claim for benefits. (Tr. at 819; *see id.* at 32–37.) Claimant's

argument that she did not is derivative of her assertions that the ALJ did not revaluate

whether Claimant's degenerative disc disease was of Listing-level severity and failed to

obtain additional evidence regarding her physical and mental impairments. (ECF No. 19

at 20.) Given the undersigned's findings relative to those contentions, the undersigned

further **FINDS** that the ALJ's RFC assessment complies with the Appeals Council's

directives.

### 4. *VE Testimony*

Because her RFC assessment differed from that of the first ALJ (*compare* Tr. at 32–33*, with id.* at 115), the second ALJ presented new hypotheticals to a different VE to determine Claimant's occupational base.  (*Id.* at 38; *see id.* at 859–62.)  The Appeals Council instructed the ALJ to obtain such testimony "[i]f warranted by the expanded record" and further directed her to present hypotheticals that "reflect the specific capacity/limitations established by the record as a whole"—*i.e.*, the RFC assessment—to "ask the [VE] to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy," and to "identify and resolve any conflicts between the occupational evidence provided by the [VE] and information in the Dictionary of Occupational Titles."  (*Id.* at 819–20.)

Claimant contends that the ALJ did not present "a hypothetical that included the full range of [her] issues" and failed to consider her attorney's hypothetical, which she claims "encompassed [her] full range of issues."  (ECF No. 19 at 20–21.)  But the ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record."  *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)).  The Appeals Council's demand that the ALJ's "hypothetical questions should reflect the specific capacity/limitations established by the record as a whole" echoes that principle. (Tr. at 819.)

In that regard, the ALJ summarized in her RFC assessment, "although the claimant has severe and non-severe physical and mental impairments, she has had conservative treatment and the evidence indicates she is able to perform at least a limited range of light level work." (*Id.* at 36.) She further explained, "the limitations found in the [RFC] assessment contain all inferences regarding the claimant's impairments and the degree of severity thereof which are raised by the objective evidence of record, and . . . a further degree of work-related restriction is not supported." (*Id.* at 36–37.) And contrary to Claimant's assertion, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)).

In sum, the hearing transcript and the ALJ's written decision reflect that she abided by the Appeals Council's instructions with regard to the VE. (Tr. at 38, 859–62.) As such, the undersigned **FINDS** that the ALJ committed no error.

### B. *Duty to Develop Record/Opinion Evidence*

Claimant next asserts that the ALJ failed to fully develop the medical evidence relating to her lumbar radiculopathy, spinal stenosis, depression, anxiety, deep vein thrombosis, gastroesophageal reflux disease, fibromyalgia, sleep apnea, and hypertension. (ECF No. 19 at 21–22.) "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *Thompson v. Colvin*, No. 3:14-cv-15949, 2015 WL 13746683, at *13 (S.D.W. Va. June 30, 2015) ("[A]n ALJ has the duty to fully

and fairly develop the record."), *adopted by* 2015 WL 5626513 (S.D.W. Va. Sept. 24, 2015).  However, the ALJ "is not required to act as Claimant's counsel" and may "presume that Claimant's counsel presented Claimant's strongest case for benefits."  *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011).  In other words, "[C]laimant, through counsel, [may not] rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation."  *Id.* (quoting *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008)).

To that end, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Id.* at *16 (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)).  Claimant does not argue that either of those conditions exist in this case.  (ECF No. 19 at 21–22.)  To the contrary, she asserts that her "considerable" "medical treatment history" is "documented by the extensive records from her medical providers." (*Id.*)  She does not claim that any of that documentation is missing from the record in this case, nor does she attempt to identify any evidentiary gaps that prevented the ALJ from making an informed decision about whether Claimant is disabled.  (*Id.*)  *See Craft v. Apfel*, 164 F.3d 624 (4th Cir. 1998) (table), 1998 WL 702296, at *3 (stating that record must contain "sufficient medical evidence . . . to make an informed decision about [claimant's] impairments"); *Laney v. Astrue*, No. 3:09-cv-00780, 2011 WL 11889, at *11 (S.D.W. Va. Jan. 4, 2011) (stating that ALJ's duty to develop record is "to insure that the record contain[s] sufficient evidence upon which she could make an informed decision" (citing *Ingraham v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007))).  As such, the undersigned **FINDS** that the ALJ adequately developed the record in this case.

Claimant's argument that the ALJ failed to do so instead appears to rest on the weight the ALJ assigned to various opinion evidence in the record. (*See* ECF No. 19 at 22.)  In particular, Claimant contends that the ALJ "ignored" the opinions of her primary care physician, Dr. Chaney, and "substituted" those of the state-agency consultants. (*Id.*)  When determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."  *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam).  A treating physician's opinion about a claimant's condition may be given "greater weight" than that of a non-treating physician "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant."  *Id.*  "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  *Id.*

Claimant's argument that the ALJ "summary [sic] ignored" Dr. Chaney's opinions is without merit.  (ECF No. 19 at 22.)  The ALJ explained that she gave his opinions "little weight" because "Dr. Chaney did not cite to specific objective findings to support such restrictions and the treatment records are not supportive of such findings."  (Tr. at 34.)  The ALJ discussed those treatment records in more detail in her review of the medical evidence.  (*Id.*)  And at the conclusion of her RFC assessment, the ALJ summarized that

33

Claimant "has multiple musculoskeletal complaints involving the back, neck, knees and shoulder, with neuropathy" but "has had conservative treatment and her pain is partially controlled with medication," although "[s]he denied improvement with physical therapy or facet blocks." (*Id.* at 36.) The ALJ further observed that Claimant "participates in a wide variety of activities, which are inconsistent with a finding of disability" and explained that "the evidence indicates [Claimant] is able to perform at least a limited range of light level work." (*Id.*) Put simply, the ALJ permissibly rejected Dr. Chaney's opinions about Claimant's functional abilities because they were insufficiently explained and because the evidence, on the whole, demonstrated that she was not so limited. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The undersigned **FINDS** that the ALJ did not err by assigning "little weight" to Dr. Chaney's opinions.[5]

## C. Combination of Impairments

Finally, Claimant argues that the ALJ failed to consider the combined effect of her impairments when assessing whether her conditions were of Listing-level severity. (ECF No. 19 at 22–23.) At the third step of the sequential evaluation process, the ALJ is tasked with determining whether the claimant's impairment or combination of impairments

---

[5] In addition, although the ALJ did not reject Dr. Chaney's opinions for this reason, the Commissioner correctly notes that they were offered nearly a year before Claimant's alleged disability onset date. (ECF No. 22 at 13.) "[M]edical opinions predating the alleged onset date are of limited relevance," and some courts do not even require such opinions to be discussed. *Simons v. Comm'r, Soc. Sec.*, No. RDB-17-cv-1837, 2018 WL 3416943, at *2 (D. Md. July 13, 2018) (quoting *Baker v. Berryhill*, 720 F. App'x 352, 355 (9th Cir. 2017)) (internal quotation marks omitted), *adopted by* 2018 WL 4863629 (D. Md. Aug. 1, 2018); *see Gullace v. Astrue*, No. 1:11-cv-0755 (TSE/JFA), 2012 WL 691554, at *24 (E.D. Va. Feb. 13, 2012) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008)), *adopted by* 2012 WL 688488 (E.D. Va. Mar. 2, 2012). *But see Cunningham v. Berryhill*, No. 5:17-cv-301-FL, 2018 WL 6731380, at *4 (E.D.N.C. Nov. 19, 2018) (requiring ALJ to consider medical opinion rendered six months prior to alleged onset date), *adopted by* 2018 WL 6729784 (E.D.N.C. Dec. 21, 2018).

meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii). "For a claimant to qualify for benefits by showing that his . . . combination of impairments[] is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531 (emphasis in original). Claimant does not even attempt to make this showing. (ECF No. 19 at 22–23.) Instead, she simply states that she "has multiple medical problems" that "totally disable her." (*Id.* at 22.) Claimant bears the burden to establish that her conditions are equivalent to a Listing. *Shinaberry v. Saul*, 952 F.3d 113, 119 (4th Cir. 2020) ("The burden lies with the claimant to make the requisite showing at the first three steps."). She has not met it here. *See Dick*, 416 F. Supp. 3d at 573 ("Meeting or equaling a listing cannot be based simply on a claimant's testimony or speculation.").

In any event, the ALJ plainly stated that she considered Claimant's impairments in combination at step three, and her analysis reflects that she did so. (Tr. at 30–32.) For instance, she noted that Claimant's "obesity may increase the severity of co-existing and related impairments," but "the evidence does not establish presumptive disability." (*Id.* at 30.) She then explained why Claimant's "musculoskeletal impairments"—that is, the *combination* of her conditions affecting her musculoskeletal system—did not satisfy Listings 1.02A and 1.04. (*Id.* at 30–31.) The ALJ also discussed her findings that Claimant's conditions did not meet or medically equal Listings 3.02 and 11.14. (*Id.* at 31.) Claimant's assertion that the ALJ disregarded the combined effect of her impairments at step three is thus meritless. The undersigned **FINDS** that the ALJ clearly did so.

To the extent Claimant also asserts that the ALJ did not consider her impairments in combination when conducting the RFC assessment, that argument likewise fails. As

part of the RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite her limitations" in light of "'all' relevant record evidence." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, No. 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker*, 889 F.2d at 49–50). "The ailments should not be fractionalized and considered in isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities." *Id.* (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)).

After reviewing the medical evidence of record, the ALJs' decisions on Claimant's previous applications for benefits, and the opinion evidence, the ALJ explained that Claimant's physical impairments necessitated only "conservative treatment" and were "partially controlled with medication" and that her mental impairments did not significantly affect "her mental health functioning" and did not require "mental health treatment" or "psychotropic medications." (Tr. at 36.) She also noted that Claimant "participates in a wide variety of activities, which are inconsistent with a finding of disability." (*Id.*) The ALJ summarized, "although the claimant has severe and non-severe physical and mental impairments, she has had conservative treatment and the evidence indicates she is able to perform at least a limited range of light level work." (*Id.*) This analysis clearly shows that the ALJ considered Claimant's impairments in combination

when performing the RFC assessment.[6]  As such, the undersigned **FINDS** that she did so.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 18), **GRANT** the Commissioner's request to affirm his decision (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

---

[6] Claimant again refers to Dr. Chaney's opinions as support for her argument that the ALJ did not consider her impairments in combination.  (ECF No. 19 at 23.)  It is unnecessary to repeat the analysis of the ALJ's treatment of his opinions here.

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: July 14, 2020

Dwane L. Tinsley
United States Magistrate Judge